Scott M. Riemer (SR 5005)
RIEMER & ASSOCIATES LLC
Attorneys for Plaintiff
60 East 42nd Street, Suite 1750
New York, New York 10165
(212) 297-0700
sriemer@riemerlawfirm.com


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

| | |
|---|---|
| NANCY LAUB, | 16 CV __770___ |
| Plaintiff, | **COMPLAINT** |
| -against- | ECF CASE |
| AETNA LIFE INSURANCE COMPANY,<br>THE DEPOSITORY TRUST & CLEARING<br>CORPORATION and THE DEPOSITORY TRUST<br>& CLEARING CORPORATION HEALTH PLAN, | |
| Defendant. | |

------------------------------------------------------------------X

Plaintiff Nancy Laub ("Laub"), by her attorneys Riemer & Associates, LLC, complaining of

Defendant Aetna Life Insurance Company ("Aetna") alleges:

1.     This is an action arising under the Employee Retirement Income Security Act of

1974, as amended ("ERISA"), 29 U. S. C. §1001, *et. seq.*, to recover benefits due under an employee

benefit plan, to clarify the rights of Plaintiff to future benefits under such plan, and to recover

attorneys' fees and costs.

2.     This Court has subject matter jurisdiction pursuant to Section 502(e)(1) of ERISA,

29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.  Under section 502(f) of ERISA, 29 U.S.C. §1132(f), this

Court has jurisdiction without respect to the amount in controversy or the citizenship of the parties.

3.      Venue is properly in this District pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. §1132(e)(2), in that the Defendant resides or may be found in this District.

**PLAINTIFF'S PARTICIPATION IN THE**
**LONG TERM DISABILITY PLAN AND THE HEALTH PLAN**

4.      At all relevant times, Plaintiff was and is a participant within the meaning of Section 3(7) of ERISA, 29 U.S.C. §1002(7), in The Depository Trust & Clearing Corporation Long Term Disability Plan (the "LTD Plan").

5.      At all relevant times, the LTD Plan is and has been an "employee welfare benefit plan" within the meaning of Section 3(1) of ERISA, 29 U.S.C. §1002(1).

6.      At all relevant time, Aetna is and has been the claims administrator of the LTD Plan within the meaning of Section 3(16)(A) of ERISA, 29 U.S.C. §1002(16)(A).

7.      At all relevant times, Aetna has been a fiduciary within the meaning of Section 3(21)(A) of ERISA, 29 U.S.C. §1002(21)(A).

8.      At all relevant times, The Depository Trust & Clearing Corporation (the "DTCC") is and has been an "employer" within the meaning of Section 3(5) of ERISA, 29 U.S.C. §1002(5), and is and has been a fiduciary under the LTD Plan within the meaning of Section 3(21)(A) of ERISA, 29 U.S.C. §1002(21)(A).

9.      Long term disability benefits under the LTD Plan have been insured in accordance and pursuant to Group Policy No. GP-653161 issued by Aetna.

10.     Plaintiff was employed as a Computer Programmer/Developer at DTCC.

11.     As an employee of the DTCC, Plaintiff was provided with long term disability insurance coverage under the LTD Plan.

12.     As an employee of DTCC, Plaintiff was provided with medical and prescription drug coverage under the DTCC Health Plan (the "Health Plan").

13.     Benefits under the Health Plan were provided by a policy issued by United Healthcare.

14.     DTCC paid the premium costs for benefits under the Health Plan for all participants eligible to receive benefits under the LTD Plan.

15.     At all relevant times, Plaintiff was and is a participant in the Health Plan within the meaning of Section 3(7) of ERISA, 29 U.S.C. §1002(7).

16.     At all relevant times, the Health Plan is and has been an "employee welfare benefit plan" within the meaning of Section 3(1) of ERISA, 29 U.S.C. §1002(1).

17.     At all relevant times, DTCC is and has been a fiduciary under the Health Plan within the meaning of Section 3(21)(A) of ERISA, 29 U.S.C. §1002(21)(A).

18.     Upon information and belief, when Aetna terminated Plaintiff's LTD benefits, DTCC terminated Plaintiff's medical benefits and prescription drug coverage under the Health Plan.

## STANDARD OF REVIEW

19.     The LTD Plan document does not contain language granting Aetna <u>discretionary</u> authority to determine the eligibility for benefits or to interpret the terms of the LTD Plan.

20.     This Court, in a prior related action (Civil Action No.: 07 CIV 9781), determined that the LTD Plan does not contain discretionary language and that the appropriate standard of review is *de novo*. *See* Judge Rakoff's April 28, 2008 Memorandum attached hereto as Exhibit "A."

## THE HISTORY OF PLAINTIFF'S LTD CLAIM AND <br> THE ADMINISTRATIVE PROCESS

21.     Plaintiff filed her LTD claim alleging that she became disabled as of April 26, 2006 as a result of Chronic Fatigue Syndrome ("CFS") and Fibromyalgia.

22.     Under the LTD Plan, "disability" is defined as follows:

From the date that you first become disabled until Monthly Benefits are payable for 24 months, you will be deemed to be disabled if:

- you are not able to perform the material duties of your own occupation solely because of: disease or injury; and
- your work earnings are 80% or less of you adjusted predisability earnings.

After the first 24 months that any Monthly Benefit is payable during a period of disability, you will be deemed to be disabled on any day if you are not able to work at any reasonable occupation solely because of:

- disease; or
- injury.

If your own occupation requires a professional or occupational license or certification of any kind, you will not be deemed to be disabled solely because of the loss of that license or certification.

23.     Plaintiff is precluded from working in "any reasonable occupation" due to the physical and cognitive symptoms associated with her Chronic Fatigue Syndrome ("CFS") and Fibromyalgia, which include, without limitation: unpredictable and debilitating fatigue and pain causing her to be bedridden; post-exertional malaise; muscle pain, soreness and achiness; all over body ache/pain; heaviness and throbbing pain/aching in the arms and legs; sleep disturbances; unrefreshed sleep; difficulty falling asleep; difficulty waking up; sore, irritated, burning painful skin on the arms and legs; pain, soreness, stiffness and swelling of the hands, fingers and knuckles; difficulty moving and using her hands and fingers for gripping/holding objects; problems with concentration, memory, following directions, reading, and handling simple tasks; nausea and abdominal pain; severe headaches; and severe congestion and sore throat.

24.     Plaintiff last worked for the DTCC on or about April 25, 2006.

*Aetna's 2006 Initial Denial of Plaintiff's Claim and Laub's 2006 Appeal*

25.     Following the submission of her claim, Aetna, by letter dated October 3, 2006, denied Plaintiff's claim for LTD benefits under the LTD Plan.  Aetna alleged that Plaintiff was not totally disabled throughout the entire 180-day elimination period.

4

26.     Plaintiff appealed Aetna's denial by letters dated April 2 and May 23, 2007.  As part of the appeal, Plaintiff submitted, without limitation: (1) a Chronic Fatigue Syndrome Residual Functional Capacity ("CFS RFC") Questionnaire by Susan Levine, M.D. dated March 2, 2007; (2) Reports from Dr. Levine dated October 16, and November 27, 2007; (3) updated Attending Physician Statement ("APS") and Capabilities and Limitations Worksheet from Dr. Levine dated October 16, 2006 and November 17, 2006, respectively; and (4) Neuropsychological Evaluation of Leo Shea, III, Ph.D. dated April 25, 2007.

27.     In her March 2, 2007, CFS RFC Questionnaire, Dr. Levine diagnosed Plaintiff with CFS and Fibromyalgia with a poor prognosis.  She indicated that Laub has unexplained persistent chronic fatigue that is not the result of ongoing exertion, and results in a substantial reduction in occupational, social and personal activities.  Dr. Levine stated that Laub "has suffered from progression of fatigue, headaches, sore throats, cognitive dysfunction and sleep problems since early 2004."

28.     In her March 2, 2007, CFS RFC Questionnaire, Dr. Levine noted that Plaintiff's ongoing symptoms include: sore throat, tender cervical or axillary lymph nodes, muscle pain, multiple joint pain without swelling or redness, headaches, unrefreshed sleep, post-exertional malaise lasting more than 24 hours, short term memory deficit, concentration limitations, information processing limitations and comprehension problems.  Dr. Levine further reported that examination findings include: palpably swollen or tender lymph nodes on physical examination; recurrent fevers; and persistent reproducible muscle tenderness on repeated examinations (including the presence of positive tender points).

29.     In her March 7, 2007, CFS RFC Questionnaire, Dr. Levine stated that Plaintiff's fatigue and other symptoms constantly interfere with her attention and concentration.

30.     In her March 7, 2007, CFS RFC Questionnaire, Dr. Levine restricted Plaintiff to less than sedentary work in that she: can sit for only 15 minutes at a time and for less than an hour total in an 8-hour workday; stand for only 5 minutes at a time, and stand/walk for a half hour total in an 8-hour workday; walk about 2 blocks without rest or severe pain; and lift/carry up to 10 pounds up to 10% of the time, and never lift over 10 pounds.   Dr. Levine also indicated that Laub would need to take unscheduled breaks; has significant limitations in doing repetitive reaching, handling or fingering; and must avoid all exposure to extreme heat, extreme cold, wetness, humidity, noise, fumes, odors, dusts, gases, poor ventilation and all hazards.

31.     In her October 16, 2006, report, Dr. Levine explained that although Plaintiff's conditions wax and wane unpredictably, "she is mainly not capable of performing any type of sustained activities.  Also, on certain days she may be able to stand for longer periods, i.e. 10-15 minutes and on others be completely bed ridden.  Despite having tried a number of treatments, including Adderal, a stimulant, she is not able to perform at a predictable level."  Dr. Levine stated that Laub has difficulty reading and writing for prolonged periods as a result of her deficits in concentration and short term memory, and that she has "advised her to go out on long term disability with an indefinite return to work date."

32.     In her November 27, 2006, narrative report, Dr. Levine noted that Plaintiff's chronic, debilitating CFS is characterized by unpredictable bouts of fatigue, musculoskeletal pain, low grade fevers, dizziness and light headedness and cognitive dysfunction.  Dr. Levine indicated that physical examination findings included a red throat; bilaterally enlarged cervical lymph nodes; decreased strength in both lower extremities; 18/18 trigger points; and difficulty counting backwards by serial 7s.  Dr. Levine reported that laboratory tests revealed prior exposure to Human Herpes Virus 6, which in implicated as a cause of CFS, and a low natural kill cell function, which is associated with poor prognosis and low response to pneumococcal antigens.

33.     In her November 27, 2006, narrative report, Dr. Levine stated that Plaintiff is "incapable of performing activities on an ongoing basis"; restricted Laub to a less than sedentary RFC; and stated "I strongly support her continued disability for an infinite period of time…"

34.     In her October 16, 2006, APS form, Dr. Levine diagnosed Laub with CFS and Fibromyalgia; noted that Plaintiff's symptoms include severe exhaustion, muscle pain and low grade fever; and stated that Plaintiff has no ability to work (*e.g.*, Severe limitation of functional capacity; incapable of minimal activity).

35.     In her November 17, 2006, Capabilities and Limitations Worksheet, Dr. Levine reported, without limitation, that Plaintiff can only occasionally sit, stand, walk, perform hand grasping, push, pull, reach above the shoulder, reach forward, carry, and bend.  Dr. Levine also indicated that Plaintiff cannot lift more than 10 pounds, crawl, kneel, and perform firm hand grasping, gross manipulations and repetitive motions.

36.     In his April 25, 2007, report, Dr. Shea indicated that a 2-day neuropsychological evaluation revealed neurocognitive weaknesses and compromised functioning in perceptual organization, speed of information processing, complex visual scanning, processing of visual detail, complex visual attention and concentration (especially under distracting conditions), various components of auditory and visual memory, higher level reasoning and decision making, word-finding and mathematical skills.  Given these deficits, Dr. Shea stated that "Ms. Laub will have difficulty in meeting the responsibilities and obligations required by her profession and in her activities of daily living."

*Aetna's Denial of Plaintiff's 2006 Appeal and the Prior Litigation*

37.     On or about August 14, 2007, Aetna denied Plaintiff's appeal.

38.     Despite the overwhelming evidence supporting Plaintiff's disability, Aetna relied on the paper reviews of Alan B. Marks, M.D. and Elana Mendelssohn, Psy.D. both of MES Solutions ("MES").

39.     Despite the detailed and supportive medical documentation from Dr. Levine, Dr. Marks erroneously concluded that the evidence fails to support a functional impairment preventing Plaintiff from working in her own occupation.

40.     Despite the detailed Neuropsychological Evaluation and statements from Laub's treating doctor, Dr. Mendelssohn erroneously concluded that Plaintiff's "overall performance across the neuropsychological tasks do not substantiate clinically significant deficits."

41.     Following receipt of the August 14, 2007 final denial from Aetna, Plaintiff commenced the prior related lawsuit (Civil Action No.: 07 CIV 9781) on or about November 5, 2007, seeking the LTD benefit to which she was entitled.

42.     During the litigation, Aetna agreed to re-review Plaintiff's claim for LTD benefits, and on or about June 23, 2008, determined that Laub was totally disabled from her own occupation and entitled to LTD benefits for up to 24 months (beginning October 23, 2006) as long as she remained disabled from her own occupation.

43.     As a result, Laub agreed to dismiss the prior related lawsuit.

*Plaintiff's Ongoing Claim for LTD Benefits*

44.     Following its review of an updated APS form from Dr. Levine and an Activities of Daily Living Questionnaire completed by Laub, Aetna, via letter dated December 6, 2008, determined that Plaintiff was totally disabled and "unable to work at any reasonable occupation."

45.     In response to Aetna's requests for updated information, Dr. Levine completed APS forms on April 19, 2010, August 31, 2011 and February 28, 2013.  In all three statements, Dr. Levine diagnosed Laub with CFS and Fibromyalgia; noted symptoms of severe exhaustion, muscle pain and

cognitive problems or sleep problems; and stated that Laub has no ability to work (*e.g.*, a severe limitation of functional capacity; incapable of minimal activity).  Dr. Levine indicated that Laub's condition "regressed" between 2011 and 2013.

46.     Dr. Levine also completed Capabilities and Limitations Worksheets on April 16, 2010 and February 28, 2013.  On both forms, Dr. Levine indicated, without limitation, that Laub can only occasionally sit, stand, walk, perform hand grasping and perform gross manipulation; never lift/carry more than 10 pounds, perform repetitive motion and firm hand grasping, twist, bend, and crawl; and must avoid exposure to heat, cold, dampness, noise, dust, fumes, chemicals and radiation. In both forms, Dr. Levine stated that due to the nature of Laub's illness, "no sustained improvement likely."

47.     Ultimately, Aetna paid Plaintiff her LTD benefits from October 23, 2006 (following the 180-day Elimination Period) through March 6, 2013 – for almost 6.5 years.

*Fully Favorable Determination by the Social Security Administration*

48.     On or about January 12, 2010, the Social Security Administration ("SSA") determined that Plaintiff was disabled under the SSA rules since April 2006.

49.     The SSA's definition of disability is significantly more restrictive than Aetna's as it requires the claimant to be unable to work in any occupation in the "national economy."

*Aetna's 2013 Termination of Plaintiff's LTD Benefits*

50.     Without any improvement in Plaintiff's symptoms, and without actually reviewing the February 28, 2013, APS form and Capabilities and Limitations Worksheet from Dr. Levine, on or about March 6, 2013, Aetna terminated Plaintiff's LTD benefits beyond March 6, 2013.

51.     The denial was allegedly due to the fact that Aetna had not yet received Plaintiff's medical records from January 2012 to the present date.

52.     Via letter dated March 11, 2013, Plaintiff submitted the medical records from Dr. Levine from February 27, 2012, through February 28, 2013, and requested that Aetna reopen Laub's LTD claim.

53.     The medical records from Dr. Levine document that Ms. Laub suffers from the following, without limitation: daily bouts of post-exertional malaise and fatigue; general malaise; chronic exhaustion; profound weakness; sore throat; swollen glands; an inability to perform even mild aerobic exercise; trouble performing even minimal activities (*e.g.*, preparing a simple meal); lightheadedness; vertigo; dizziness; cognitive problems; difficulty reading for more than short periods of time; difficulty with excessive noise and light stimulation; and achiness in the joints of the hips and knees.  Dr. Levine consistently diagnosed Plaintiff with CFS and stated that she remains disabled.

54.     After allegedly reviewing the documentation from Dr. Levine, on or about May 13, 2013, Debbi Featherstone, Senior LTD Claim Analyst, informed Plaintiff of Aetna's determination to discontinue her claim for LTD benefits beyond March 6, 2013.

55.     In doing so, Aetna relied on the paper review by Dr. Siva Ayyar from MES, dated April 1, 2013.

56.     Despite acknowledging the presence of "multiple trigger points and palpable bilateral anterior lymph nodes" along with Plaintiff's symptoms of fatigue, malaise, poor sleep and cognitive difficulties, Dr. Ayyar erroneously concluded that Laub did not have any restrictions and limitations between January 1, 2013 and June 30, 2013, and that she could work at the "very heavy physical demand level."

57.     Dr. Ayyar failed to explain how Plaintiff, who has been rendered disabled from any occupation for over 6.5 years, was capable of performing work at a "very heavy physical demand level."

10

58.     Dr. Ayyar did not review all of Plaintiff's medical records.  In particular, Dr. Ayyar did not review Laub's pre-2013 medical records in order to understand the totality and history of Laub's conditions.

59.     Dr. Ayyar lacked a complete understanding regarding Laub's medical conditions and CFS and Fibromyalgia, in general.

*Plaintiff's 2013-2014 Appeal of Aetna's Termination*

60.     On or about November 7, 2013, Plaintiff formally appealed Aetna's discontinuation of her LTD benefits and requested that her claim be tolled until an adequate appeal could be presented.

61.     Via letters dated April 24, 2014 and May 27, 2014, Plaintiff perfected her appeal by submitting objective medical evidence, including, but not limited to: (1) Narrative Reports from Dr. Levine dated May 15, 2013 and March 26, 2014; (2) CFS RFC Questionnaire from Dr. Levine dated March 28, 2014; (3) Updated Medical Records from Dr. Levine; (4) Medical Records from Dr. Susan Rosen; (5) Functional Capacity Evaluation ("FCE") completed by Susan Greenberg, MS, PT dated April 14 and April 15, 2014; and (6) Neuropsychological Reevaluation completed by Dr. Shea dated May 22, 2014.

62.     In her May 15, 2013, Narrative Report, Dr. Levine responded to Dr. Ayyar's questions and confirmed Plaintiff's total disability.  Dr. Levine explained that Laub experiences the following symptoms on a daily basis: malaise; fatigue; generalized weakness; sleep disturbances; neurocognitive complaints including easy confusability and slowed processing speed of new information; autonomic system complaints; thermoregulatory problems; and vertigo.

63.     In her May 15, 2013, Narrative Report, Dr. Levine stated "Nothing has changed in terms of the degree and frequency of this patients symptoms over the last seven years to allow her to function in a predictable manner.   Although her symptoms wax and wane in severity, the claimant

does not experience any 'good' days as do some of my patients with CFS.  She is almost always homebound."

64.      In her May 15, 2013, Narrative Report, Dr. Levine stated "I fully affirm that she [Laub] remains disabled and because patients who have been ill to the degree that this claimant has are unlikely to recover her prognosis for recovery is poor."

65.      In her March 26, 2014, Narrative Report, Dr. Levine opined that "there has been no change in [Laub's] condition and she remains completely disabled…" as a result of her CFS.

66.      In her March 26, 2014, Narrative Report, Dr. Levine stated that Plaintiff's CFS is "characterized by post-exertional malaise; neurocognitive complaints; overall weakness; and non-refreshing sleep.  The patient also experiences the following symptoms which are worsened following even minimal mental or physical exertion: headaches; sore throats; photophobia; night and daytime sweats; skin rashes; hair loss; mouth sores; and incomplete emptying of her bladder."

67.      In her March 26, 2014, Narrative Report, Dr. Levine explained that Plaintiff takes Adderal – a stimulant – which, despite interfering with her sleep, enables "her to be awake for at least a few hours during the day during which she can accomplish minimal tasks, such as feeding herself and sitting up in a chair…"  Dr. Levine indicated that "on a 'bad' day she may spend 12 hours just lying in bed afraid to walk to the bathroom lest she pass out and be home unattended. She cannot concentrate.  She looks at a newspaper and after a few sentences the words are 'swimming' in front of her."

68.      In her March 28, 2014, CFS RFC Questionnaire, Dr. Levine diagnosed Plaintiff with CFC and Fibromyalgia with a poor prognosis.  She indicated that Laub has unexplained persistent chronic fatigue that is not the result of ongoing exertion, and results in a substantial reduction in occupational, social and personal activities.  Dr. Levine stated that Laub has a history of fatigue which "is completely disabling."

12

69.     In her March 28, 2014, CFS RFC Questionnaire, Dr. Levine noted that Plaintiff's ongoing symptoms include: an impairment in short term memory or concentration severe enough to cause substantial reduction in previous levels of occupational, educational, social or personal activities; sore throat; tender cervical or axillary lymph nodes; muscle pain; multiple joint pain without swelling or redness; headaches; unrefreshed sleep; and post-exertional malaise lasting more than 24 hours; concentration limitations; information processing limitations; comprehension problems; anxiety; and depression.  Dr. Levine further reported that clinically documented medical signs and laboratory findings include: nonexudative pharyngitis; a positive Rhomberg sign; positive reactivity to Epstein-Barr virus; and human herpesvirus 6.

70.     In her March 28, 2014, CFS RFC Questionnaire, Dr. Levine stated that Plaintiff's fatigue and other symptoms constantly interfere with her attention and concentration, and noted that "even minimal physical or mental stress will aggravate her fatigue."

71.     In her March 28, 2014, CFS RFC Questionnaire, Dr. Levine restricted Plaintiff to less than sedentary work in that she: can sit for only 20 minutes at a time and for less than 2 hours total in an 8-hour workday; stand for only 1-2 minutes at a time, and stand/walk for less than a half hour total in an 8-hour workday; walk about 2-3 blocks without rest or severe pain; and lift/carry up to 10 pounds up to 10% of the time.   Dr. Levine also indicated that Laub would need to take unscheduled breaks for 15-20 minutes; has significant limitations in doing repetitive reaching, handling or fingering (*e.g.* can perform up to only 5% of an 8-hour workday, repetitively); and must avoid all exposure to extreme heat, extreme cold, wetness, humidity, noise, fumes, odors, dusts, gases, poor ventilation and all hazards.  Dr. Levine stated that Laub is totally disabled from any occupation due to her "severe fatigue, muscle weakness and neurocognitive complaints."

72.     The updated medical records from Dr. Levine dating from May 13, 2013, through March 6, 2014 continue to document Plaintiff's ongoing fatigue, daily bouts of post-exertional

malaise, weakness and feeling rundown.  Examination consistently revealed ½ by ½ cm bilateral anterior cervical lymph nodes.

73.     On May 13, 2013 and June 14, 2013, Dr. Levine also found trigger points across the anterior chest, hips, and both sides of the occiput; and a positive Rhomberg sign.

74.     On May 13, 2013, Dr. Levine indicated that Plaintiff has difficulty walking more than a block and a half without stopping to rest; exhaustion if she has to listen to someone speaking for more than 10 minutes at a time; and worsening sore throats, headaches, and low grade fevers.

75.     On June 14, 2013, Dr. Levine indicated that Laub did not retain the capacity to perform physical activity for more than 15 minutes at a time without a break (including dressing, simple meal preparation, reading, and watching TV).  On both of the above dates, Dr. Levine opined that Laub is "incapable of gainful employment."

76.     In her updated office notes from May 13, 2013, through March 6, 2014, Dr. Levine consistently stated that Laub's CFS remains disabling.

77.     In her March 12, 2013, report, Dr. Rosen confirmed Plaintiff's diagnosis of CFS and Fibromyalgia, her elevated blood pressure, livedo reticularis of the knees and bilateral arms and headaches.  Dr. Rosen recommended additional testing including, without limitation, an ECG and a hearing test.

78.     A Distortion-Product Otoacoustic Emission Test dated March 12, 2013, revealed that Plaintiff did not pass the DP Standard Screen for both ears as she only achieved 2 passing results for the left ear and 1 passing result for the right ear.  3 frequencies are required to "pass" the test.

79.     An ECG dated April 10, 2013, revealed mild concentric left ventricular hypertrophy; mitral E to A reversal consistent with mild diastolic dysfunction; trace mitral regurgitation; and trace tricuspid regurgitation.

80.     In the FCE from April 14 and April 15, 2014, Greenberg found decreased muscle strength of the trunk, neck, hips, knee joints, ankles, shoulders, elbows, forearms, wrist joints and hands; weakness of the upper back extensors and lower extremities; heaviness in the arms and legs; hypersensitivity of the skin (mostly the legs); trunk shifting to the right; hyperextension of the spine secondary to poor scapula and core stabilization; decreased grip strength; generalized weakness; and fatigue.

81.     The FCE revealed that Plaintiff: can only sit occasionally; has below average bilateral hand grip and pinch grip strength; has weakness of the bilateral lower extremities which affects her pace and endurance during ambulation; demonstrates difficulty with gross/fine motor coordination and dexterity skills; and can squat rarely.  Greenberg also noted that Laub "fatigues easily, especially when sitting or standing statically, and must change positions frequently (every 15 minutes at the onset of the test then every 10 to 12 minutes or less once the test progressed)," and that she has constant muscle and joint pain which is aggravated by muscle weakness, poor musculoskeletal endurance and compensatory postures.

82.     Greenberg also found that cognitive issues were a contributing factor to Plaintiff's decreased performance in that Laub exhibited: decreased ability to focus on task and was easily distracted; decreased ability to recall directions for the second trial of an activity that she had just completed the first trial of; confusion; difficulty finding the correct word or phrase; and difficulty concentrating.

83.     Greenberg concluded that Laub "is currently unable to function even at the sedentary physical demand level due to the high level of dysfunction caused by the above described symptoms in multiple muscle groups and joints, as well as her severe fatigue.  She is also not able to tolerate an 8-hour work day due to positional intolerances in sitting, increased fatigue with deterioration of movements as tasks progress, and poor musculoskeletal endurance."

84.     In his May 22, 2014, Neuropsychological Reevaluation, Dr. Shea found that "[w]hile present testing shows some minor increases in certain domains, overall, [Laub] is at significant deficit both based on reported functioning and in statistical comparisons of intellect to domains of attention, concentration, memory and various aspects of executive functioning, all of which are necessary components to effectively carry out the requirements of her previous job or any job for which she has been fitted by education, training or experience.  The results of her present testing confirm that Ms. Laub would not be able to access her innate level of intellect on a consistent basis" in order to perform the duties of any occupation based on her training, education and experience.

*Medical Examination by Jeffrey S. Liva, M.D. of Access Medical*

85.     At Aetna's insistence, following the submission of her appeal, Plaintiff underwent an independent medical examination ("IME") with Jeffrey S. Liva, M.D. of Access Medical Evaluations, Inc. ("Access Medical"), Occupational Medicine, on December 18, 2014.

86.     Plaintiff was accompanied by her sister, Jacqueline Robertson, to observe and document the examination by Dr. Liva.

87.     In his December 18, 2014, report, Dr. Liva acknowledged Laub's extensive list of symptoms and diagnosed her with CFS, Fibromyalgia, and a Parasympathetic Nerve Abnormality which causes flushing in the skin, headaches and hypertension.  Dr. Liva stated that "the subjective complaints are consistent with objective findings."

88.     However, Dr. Liva erroneously found that Plaintiff has work capacity in that: "Climbing, crawling, kneeling, lifting, pulling, pushing, and carrying would be limited to one hour in an eight-hour period.  The examinee could continuously reach above the shoulder, forward reaching, hand grasping, gross manipulations, repetitive motions, sitting, standing, stooping, and walking.  The examinee would be unable to lift greater than 10 lb.  She could continuously lift 10 lb or less.  She could hold static movements with respect to her head and neck, and frequent flexion and frequent

16

rotation.  There are no limitations with respect to speaking, vision, depth perception, or hearing."

Dr. Liva also alleged that symptom magnification was evident with regard to Plaintiff's pain levels.

89.     In her rebuttal report dated January 26, 2015, without limitation, Dr. Levine

disagreed with Dr. Liva's findings because:

- Dr. Liva does not differentiate between Fibromyalgia and CFS.  Dr. Levine stated: "The latter is what causes the patient to be completely disabled and is NOT evaluable during a short physical exam.  The fact that Dr. Liva reports the patient can 'move all four extremities'; that she did not 'have muscle weakness in any of the extremities'; and that he emphasizes his findings on the 'hand dynamometer' evaluation leads me to believe that he is thoroughly unfamiliar with the Chronic Fatigue Syndrome as defined by the Canadian Case definition (CCC)."

- Dr. Liva did not account for Plaintiff's post-exertional malaise, which occurs anywhere from ½ hour to 1 week following even minimal physical or cognitive exertion in a CFS patient.  Dr. Levine noted that the post-exertional malaise "cannot be measured on a physical exam that focuses on trying to find 'trigger points' and other findings which are more consistent with Fibromyalgia."

- Dr. Liva did not consider Laub's treatment history with Dr. Levine "in which she has related on a monthly basis her severe degree of incapacity following even minimal exertion which prevents her from leaving her apartment, except for doctors' appointments."

- Dr. Liva's statement that Plaintiff was exaggerating her responses on the pain questionnaire is unfounded.  Dr. Levine stated: "I believe that along with her profound fatigue, cognitive disturbances and unrefreshing sleep, that her severe musculoskeletal pain, which is significantly magnified after even minimal exertion is a major component of her disease."

90.     In her rebuttal report dated January 26, 2015, Dr. Levine stated: "I completely

disagree with the level of restrictions that Dr. Liva has imposed on Ms. Laub…I don't feel that his

reliance on the "Dictionary of Occupational Titles' is an appropriate resource on which to base his

opinion on Ms. Laub's disability status.  Based on his comments I see no reason to assume that Dr.

Liva has any knowledge relating to CFS and its natural history, the disability it causes, the fact that

there is no 'cure'…  Dr. Levine concluded by stating "In my opinion, Ms. Laub remains completely

disabled for an indefinite period of time."

_Plaintiff's Submission of Additional Information_

91.     At Plaintiff's request, Aetna provided a copy of the IME Report and agreed to put the appeal review on hold to give Laub the opportunity to submit additional information.

92.     Via letter dated March 16, 2015, Plaintiff submitted additional evidence, including, but not limited to: (1) Cardiopulmonary Exercise Test ("CPET") Protocol Report from Dr. Betsy Keller dated February 27, 2015; (2) Rebuttal Report from Dr. Levine dated January 26, 2015 (discussed above); and (3) Vocational Evaluation Report from Amy P. Leopold, MS, CRC dated March 11, 2015.

93.     In her CPET Protocol Report dated February 27, 2015, Dr. Keller explained that job tasks similar to those found in Laub's occupation range from 1.5 to 3 METs – which is 25-50% of Laub's maximum capacity.   Dr. Keller stated that Plaintiff's "post-exertional symptoms are precipitated by both physical and cognitive effort.   Given physical and cognitive impairments observed during her testing, her physical and cognitive abilities to successfully navigate public transportation, for example, are unlikely.   It is important to note that post-exertional exhaustion can occur immediately after physical activity or can be delayed for hours or days, thus it is plausible because of the cyclic nature of her symptoms, that Ms. Laub's low functional capacity could decline further over days following physical and/or cognitive exertion.   Her variable sleep/wake cycles and resultant inability to perform normal daily self-care and work-related activities is consistent with the nature of this illness."

94.     In her CPET Protocol Report dated February 27, 2015, Dr. Keller concluded that "Based on the results of her test, her ability to perform normal daily activities is very limited and the resultant post exertion symptoms renders her unable to perform at a sedentary level in a competitive work environment, or engage in normal activities of daily living."

95.     In her Vocational Assessment dated March 11, 2015, based on her telephone conversation with Laub, her review of the relevant medical documentation and her review of Laub's work history and skills, Leopold found that Plaintiff is unable to perform even sedentary work as a result of her physical and cognitive impairments and her need for "unscheduled absences that would not be tolerated in any position."

96.     Leopold concluded by stating: "It is this Consultant's opinion that Ms. Laub is permanently disabled from her own occupation as Computer Programmer/Developer as well as all occupations in the national economy and should be awarded her disability benefits in full.  Ms. Laub could not perform the essential duties of any occupation due to her chronic fatigue syndrome and fibromyalgia, which make her unable to focus or concentrate for prolonged periods."

*Aetna's Final Denial of Plaintiff's LTD Claim*

97.     On or about April 3, 2015, Susan Dorman, Senior Appeal Specialist, informed Plaintiff of Aetna's determination to uphold the denial of her LTD benefits.

98.     In doing so, Aetna relied on Dr. Liva's assessment and paper reviews conducted by Elena Antonelli, M.D. and Keven Anne Murphy, Ph.D., both from MLS Group of Companies, Inc. ("MLS").

99.     Despite the overwhelming evidence of Plaintiff's disability, Dr. Antonelli concluded that "there is little data of an objective nature to support impairment from 03/06/2013 through 03/30/2015."

100.    Like the IME physician and Aetna's other peer review doctors, Dr. Antonelli and Aetna failed to consider the nature of CFS – specifically, Laub's severe post-exertional malaise, and the fact that CFS does not lend itself to objective physical examination findings.

101.    Dr. Antonelli and Aetna incorrectly claim that Laub's symptoms and inability to work is inconsistent with her ability to live alone.  In doing so, Dr. Antonelli and Aetna ignored the statements from Laub and Dr. Levine that while she does live alone, she has significant help from her family and frequently orders food, meals, and other basic necessities to be delivered to her home.

102.    Despite acknowledging that Plaintiff's cognitive functioning "is not at baseline," Dr. Murphy erroneously concluded that "the formal neuropsychological assessment [from Dr. Shea] did not document frank cognitive impairment on formal tests of cognition" and incorrectly alleged that any cognitive dysfunction was due to an untreated depression with somatic features.

103.    Dr. Murphy and Aetna failed to explain how Plaintiff would be capable of working in any occupation given her cognitive deficits, and he did not consider Laub's post-exertional malaise – which occurs following even minimal physical or cognitive exertion in a CFS patient – as part of her assessment.

104.    Drs.    Antonelli    and    Murphy    did    not    review    all    of    the    medical documentation/questionnaires from Dr. Levine.

105.    According to Aetna's April 3, 2015 adverse determination, "Since we've made our final decision, no other action will be taken by us."

106.    Therefore, pursuant to 29 C.F.R. §2560.503-1(1), Plaintiff has complied with and exhausted all administrative appeals under the LTD Plan.

## AETNA'S CONFLICT OF INTEREST

107.    At all relevant times, Aetna has been operating under an inherent and structural conflict of interest as Aetna is liable for benefit payments due to Plaintiff and each payment depletes Aetna's assets.

108.    Aetna's determination was influenced by this conflict of interest.

*Aetna's Cozy Relationship with MES, MLS and Access Medical*

109.    Aetna knows, or had reason to know, that MES, MLS and Access Medical serve only insurance companies and never individual claimants.

110.    MES, MLS and Access Medical each hold itself out to the general public as a company that provides services related to administering medical examinations and file reviews among the services for which it receives direct payment.

111.    MES, MLS and Access Medical enter into service agreements with insurance companies, including Aetna, for regular provision of claims related services, including locating and vetting doctors and other consultants interested in performing medical consulting services to the disability industry.

112.    Upon information and belief, Aetna pays MES, MLS and Access Medical substantial sums of money to provide file reviews for Aetna's insureds.

113.    Upon information and belief, Aetna is an important client of MES, MLS and Access Medical, accounting for a substantial percentage of their annual revenue.

114.    Because Aetna provides substantial revenue to MES, MLS and Access Medical, each has an incentive to provide Aetna with reviews that Aetna deems favorable in order to preserve Aetna as a client.

*Aetna's Cozy Relationship with Drs. Ayyar, Antonelli, Murphy and Liva*

115.    Aetna knows, or has reason to know, that the medical consultants retained by MES, MLS and Access Medical to complete file reviews and independent medical examinations serve only insurance companies and never individual claimants.

116.    Through MES, MLS and Access Medical, Aetna pays Drs. Ayyar, Antonelli, Murphy and Liva substantial sums of money to provide file reviews or independent medical examinations for Aetna's insureds.

117.    Because the medical consultants derive substantial income for performing file reviews or independent medical examinations for Aetna insureds, each has an incentive to provide file reviews or independent medical examinations that Aetna deems favorable in order to perform future reviews for Aetna's insureds.

*Aetna Has Not Reduced Its Conflict of Interest*

118.    Aetna has failed to take active steps to reduce potential bias and to promote the accuracy of its benefit determinations.

## COUNT I (Aetna)

119.    Plaintiff repeats and realleges the allegations of paragraph 1 through 118 above.

120.    Aetna had no legal basis for terminating Plaintiff's benefits.

121.    Under the terms of the LTD Plan, Aetna agreed to provide Plaintiff with certain disability insurance benefits in accordance with the terms and conditions set forth.

122.    To date, Aetna has failed and refused to pay Plaintiff the benefit to which she is rightfully entitled from March 6, 2013 to the present.

123.    Plaintiff has satisfied all conditions precedent under the LTD Plan and is thus eligible to receive benefits.

124.     Aetna's determination that Plaintiff was no longer totally disabled within the meaning of the LTD Plan is contrary to the terms of the LTD Plan, contrary to the medical evidence, unreasonable, and an abuse of discretion.

125.     Aetna has financial conflicts of interest with respect to handling, monitoring, and eventually denying Plaintiff's disability benefits.

126.     Aetna was influenced by its financial conflict of interest, as both the administrator of the LTD Plan and the payor of benefits thereunder, when deciding to deny Plaintiff's disability benefits.

127.     The unlawful behavior of Aetna is evidenced by the following:

a.     Denying benefit payments to Plaintiff at a time when it knew that she was entitled to said benefits under the terms of the LTD Plan, in bad faith and contrary to the LTD Plan;

b.     Unreasonably withholding payments from Plaintiff knowing her claims for benefits were valid;

c.     Unreasonably failing to pay benefits without having any evidence, substantial or otherwise, supporting its decision to deny benefits;

d.     Completely disregarding Plaintiff's treating physicians' assessment of Plaintiff's medical conditions and how they restrict and limit her from performing any occupation without any basis for doing so;

e.     Selectively highlighting certain factors in medical reports in order to cast favorable light on its position, while ignoring the conclusions of Plaintiff's treating physicians regarding the conditions for which they render treatment;

f.     Completely disregarding Plaintiff's own assessment of her medical condition and how it restricts her from performing any occupation;

23

g.  Engaging in a pattern of procedural irregularities in order to advance its own corporate interests in terminating benefits, to the detriment of LTD Plan participants;

h.  Failing to maintain and utilize "reasonable claims procedures" as it was obligated to do pursuant to 29 C.F.R. §2560.503-1(b), in violation of ERISA;

i.  Failing to provide a "full and fair review" as it was obligated to do pursuant to 29 C.F.R. §2560.503-1(h)(4);

j.  Consistently acting in its own corporate interests instead of those of the LTD Plan and its participants;

k.  Improperly denying Plaintiff's benefits without any information that her condition had improved from the time Aetna initially approved her claim; and

l.  Improperly refusing to review medical documentation pertinent to Plaintiff's condition.

128.  Aetna breached its fiduciary duty by failing to fairly review and reasonably interpret the reports prepared by Plaintiff's treating and examining physicians, and failing to consider material relevant to her medical condition. Instead, Aetna created an artificial reason for denying Plaintiff's disability benefits. Aetna selectively highlighted certain factors in medical reports, in order to cast a favorable light on its positions while ignoring the conclusions of Plaintiff's treating doctors regarding the condition for which they rendered treatment.

129.  Aetna breached its fiduciary duty to Plaintiff by placing its financial interests in reducing its expenses and increasing its profitability above Plaintiff's interests under the LTD Plan to receive disability benefits.

130.  A "higher than marketplace" quality standard, as set forth in *Metropolitan Life Ins. Co. v. Glenn*, 128 S.Ct. 2343 (2008), applies to evaluating the actions of Aetna in this case.

131.     Aetna was required to discharge its duties "solely in the interests of the participants and beneficiaries of the plan."

132.     Aetna violated the "higher-than-marketplace" standards that ERISA imposes on insurers.

133.     Plaintiff has been forced to bring the instant action as a direct result of Aetna's unlawful denial and violations of the LTD Plan and ERISA.

134.     Under Section 502(a)(1)(B) of ERISA, 29 U.S.C. §1132(a)(1)(B), Plaintiff is entitled to recover disability benefits under the LTD Plan that have not been paid from March 6, 2013 to the present, with interest, and those that may become due in the future.

## COUNT II (Aetna)

135.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 134 above.

136.     By reason of Aetna's failure to pay Plaintiff long term disability benefits as due under the terms of the LTD Plan, Plaintiff has been forced to retain attorneys to recover such benefits for which Plaintiff has and will continue to incur attorney's fees.   Plaintiff is entitled to recover reasonable attorney's fees and the costs of this action, pursuant to Section 502(g)(1) of ERISA, 29 U.S.C. §1132(g)(1).

## COUNT III (DTCC and the Health Plan)

137.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 136 above.

138.     DTCC and the Health Plan terminated Plaintiff's coverage as an employee in the Health Plan while she was still entitled to coverage.

139.     Plaintiff incurred expenses as she was required to pay medical and prescription medication bills out-of-pocket that would have been covered under the Health Plan.

140.    Under Section 502(a)(1)(B) of ERISA, 29 U.S.C. §1132(a)(1)(B), Plaintiff is entitled to recover benefits under the Health Plan that have not been paid to date and those that will become due in the future.

## COUNT IV (DTCC and the Health Plan)

141.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 140 above.

142.    By reason of DTCC and the Health Plan's failure to pay Plaintiff's health benefits as due under the terms of the Health Plan, Plaintiff has been forced to retain attorneys to recover such benefits, for which Plaintiff has and will continue to incur attorney's fees.  Plaintiff is entitled to recover reasonable attorney's fees and the costs of this action, pursuant to Section 502(g)(1) of ERISA, 29 U.S.C. §1132(g)(1).

WHEREFORE, Plaintiff demands judgment against Aetna:

A.    For the Amount of all long term disability benefits due under the terms of the LTD Plan that have not been paid, together with interest thereon;

B.    Clarifying and declaring that the LTD Plan may be obligated to pay Plaintiff long term disability benefits in the future as required by the LTD Plan;

C.    For the cost of this action and Plaintiff's attorney's fees, pursuant to Section 502(g) of ERISA, 29 U.S.C. §1132(g); and

D.    For such other and further relief as may be deemed just and proper by the Court.

WHEREFORE, Plaintiff demands judgment against DTCC and/or the Health Plan:

A.    For the reimbursement of out-of-pocket expenses/payments for medical services and prescription medications that would have been covered under the Health Plan, together with interest thereon.

B.    Clarifying and declaring that Plaintiff is entitled to reinstatement of coverage under the Health Plan in the future as required by the terms of the Health Plan;

26

C.    For the costs of this action and Plaintiff's attorneys' fees, pursuant to Section 502(g)

of ERISA, 29 U.S.C. §1132(g); and

D.    For such other and further relief as the Court deems just and proper.

Dated:  New York, New York
        February 2, 2016

                                        RIEMER & ASSOCIATES LLC
                                        Attorneys for Plaintiff
                                        60 East 42nd Street, Suite 1750
                                        New York, New York 10165
                                        (212) 297-0700


                              By:        /s/ Scott M. Riemer
                                        Scott M. Riemer (SR 5005)